**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

KATHALEEN ST. JUDE MCCORMICK
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

January 27, 2026

Stephen E. Jenkins
Tiffany Geyer Lydon
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19801

Joseph L. Christensen
Christensen Law LLC
1201 N. Market Street, Suite 1404
Wilmington, DE 19801

Justin O. Reliford
Scott + Scott Attorneys At Law LLP
222 Delaware Avenue, Suite 1405
Wilmington, DE 19801

Matthew D. Stachel
Sabrina M. Hendershot
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1313 N. Market Street, Suite 806
Wilmington, DE 19801

Michael J. Maimone
Gabriella Mouriz
Barnes & Thornburg LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801

Andrea S. Brooks
Wilks Law, LLC
4250 Lancaster Pike, Suite 200
Wilmington, DE 19805

Lakshmi A. Muthu
M. Paige Valeski
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N. King St.
Wilmington, DE 19801

David S. Eagle
Alyssa M. Radovanovich
Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801

Marc S. Casarino
Katie Barksdale
Kennedys CMK LLP
222 Delaware Avenue, Suite 710
Wilmington, DE 19801

Re:  *Electric Last Mile Solutions, Inc. Stockholder Litigation*
C.A. No. 2022-0630-KSJM

Dear Counsel:

This letter decision addresses the motions to dismiss filed by Defendant Jefferies LLC and Defendant SF Motors, Inc.[1] SF Motors' motion is granted. Jefferies's motion is denied.

## I.    FACTUAL BACKGROUND

The facts are drawn from the First Amended Verified Consolidated Stockholder Class Action Complaint (the "Amended Complaint") and the documents it incorporates by reference.[2]

Former automotive executives James Taylor and Jason Luo formed Electric Last Mile, Inc. ("Legacy ELMS") in 2020. The startup presented itself as a viable commercial electric vehicle manufacturer.

Forum III Merger Corporation ("Forum III") was a special purpose acquisition company ("SPAC") formed on June 25, 2019. It went public on August 21, 2020, raising $250 million. It had two years to complete a merger with a target company. Failing to do so meant it would have to cease operations and redeem its public stockholders in cash with interest. Before it went public, Forum III started discussions with Luo about a merger with Legacy ELMS. Forum III and Legacy ELMS continued discussions through the fall of 2020.

---

[1] C.A. No. 2022-0630-KSJM, Dockets ("Dkts.") 210, 212.

[2] Dkt. 168 (Am. Compl.).

Around this time, SF Motors, a U.S. subsidiary of Chinese automotive conglomerate Chongqing Sokon Industry Group Stock Co., Ltd. ("Sokon"), scaled back its U.S. operations. Once described in the media as a Tesla competitor, SF Motors largely halted its U.S. vehicle development efforts by mid-2019 and laid off at least 90 employees.[3]

In September 2020, Legacy ELMS, Sokon, and SF Motors executed a series of agreements (the "Carveout Agreements"), including a purchase and sale agreement for SF Motors' Mishawaka, Indiana manufacturing plant (the "Indiana Plant"), as well as IP licensing agreements and supply arrangements.

In October 2020, Forum III formally retained Jefferies LLC as its financial advisor with fees contingent on Forum III's completion of a business combination. Jefferies ultimately received about $19.3 million after Forum III merged with Legacy ELMS. Although Jefferies did not deliver a formal fairness opinion, it assisted in preparing investor materials and engaged in diligence with Forum III's board.

On December 10, 2020, Forum III and Legacy ELMS entered into an Agreement and Plan of Merger (the "Merger Agreement"), to combine the two companies and take Legacy ELMS public through the SPAC structure (the "Merger"). On February 10, 2021, Legacy ELMS entered a non-binding term sheet with SF Motors, under which Legacy ELMS would transfer five million shares of Forum III

---

[3] *See* Am. Compl. ¶ 61 n.10; Dkt. 210 ("Jefferies Opening Br."), Ex. A at 2.

stock, valued at approximately $50 million, to SF Motors for "strategic cooperation, consulting, and technical support."[4]

On April 9, 2021, Legacy ELMS and SF Motors entered an Asset Purchase Agreement under which Legacy ELMS agreed to purchase the Indiana Plant from SF Motors for $145 million.[5] Payment of the purchase price would consist of payments for the Indiana Plant's real property and its other property.[6] Later, on May 7, 2021, Forum III and Legacy ELMS amended the Merger Agreement. Under the amendment, SF Motors agreed to receive "5,000,000 shares of common stock" in lieu of Legacy ELMS's remaining payment obligations under the Asset Purchase Agreement.[7]

On June 9, 2021, Forum III issued a proxy statement describing the proposed Merger to its stockholders (the "Proxy Statement"). The Proxy Statement described the events leading up to the proposed Merger and included summaries of the Carveout Agreements, the share award to SF Motors, and Legacy ELMS's financial

---

[4] Am. Compl. ¶ 143; Dkt. 219 ("Pls.' Answering Br."), Ex. H at 13 ["Proxy Statement"].

[5] Proxy Statement at 36; *id.*, Annex N ("Asset Purchase Agreement") at N-1, N-24. The court takes judicial notice of the Asset Purchase Agreement, which is incorporated by reference into the Amended Complaint.

[6] Asset Purchase Agreement at N-3. The real property payments were stated in a separate land-sale contract that called for (i) an $18,620,689.66 up front payment and (ii) twenty three consecutive monthly installments of $3,103,348.28 totaling $71,379,310.34. *Id.* Payments for non-real property consisted of (i) an $11,379,310.34 up-front payment and (ii) a $43,620,689.66 promissory note payable in monthly installments. *Id.*

[7] Proxy Statement at 111.

projections. It did not include analysis justifying the financial projections, information on changes in Taylor's and Luo's equity interests prior to the Merger, or the basis for the $50 million equity transfer to SF Motors. It did, however, attach the Asset Purchase Agreement.

Forum III's stockholders approved the Merger on June 24, 2021. Public stockholders holding 13,922,942 shares of Forum III's Class A common stock elected not to redeem their shares and remained invested in the post-Merger entity. The remaining public stockholders, holding 11,077,058 shares, elected to redeem. The Merger closed and the surviving company was named Electric Last Mile Solutions, Inc. ("ELMS"). Luo became its Executive Chairman and Chairman of the board. Taylor became its CEO.

ELMS's post-Merger operations were short-lived. On February 1, 2022, ELMS publicly announced that both Taylor and Luo had resigned after an internal investigation revealed they had acquired discounted equity in Legacy ELMS prior to the Merger without board approval or proper disclosure. On June 14, 2022, ELMS filed for Chapter 7 bankruptcy liquidation.[8]

Multiple Forum III stockholders ("Plaintiffs") filed actions in connection with the Merger, which the court consolidated on November 15, 2022.[9] Plaintiffs filed their consolidated amended class action complaint on November 30, 2022.[10] In addition to

---

[8] Am. Compl. ¶ 190.

[9] Dkt. 55.

[10] Dkt. 63.

breach of fiduciary duty claims against Forum III directors and Forum III affiliates, Plaintiffs asserted aiding and abetting claims against Taylor and Luo.

On January 22, 2024, the court denied Taylor's and Luo's motions to dismiss.[11] Relevant here, the decision recognized Taylor's and Luo's participation in "three categories of misleading or omitted information."[12] The first was the "extraordinary projections Taylor and Luo" distributed "in the 'hyping' period" evidencing Taylor's and Luo's knowledge of the wrongdoing.[13] The projections belonged to Legacy ELMS, and the decision attributed Taylor's and Luo's conduct to Legacy ELMS.[14] The "hyping" period, as alleged in the Amended Complaint, began no earlier than December 11, 2020, after Taylor and Luo were employed by Legacy ELMS.[15] The second category of misleading information was the omission of the supplier agreement between Legacy ELMS and Liuzhou Wuling Automobile Industry Co., Ltd. ("Wuling") from the Proxy Statement.[16] The third category concerned Taylor's and Luo's personal acquisitions of Legacy ELMS shares prior to the Merger.[17]

---

[11] *Electric Last Mile Sols., Inc. S'holder Litig.*, 2024 WL 223195, at *1 (Del. Ch. Jan. 22, 2024).

[12] *See id.* at *3.

[13] *Id.*

[14] *See, e.g., id.* at *4 ("Given that Luo and Taylor were managers and directors of [Legacy ELMS], the court can infer they would know the true financial picture of [Legacy ELMS]. This inference is further supported by Luo and Taylor's grandstanding to stockholders over [Legacy ELMS's] future performance[.]").

[15] *See* Am. Compl. ¶¶ 127, 129–36.

[16] *See Electric Last Mile Sols.*, 2024 WL 223195, at *3.

[17] *Id.*

The court also considered the effect of Legacy ELMS's contractual obligation to review the Proxy Statement for inaccuracies.[18]  It held that, if proven to exist, the obligation would establish Taylor's and Luo's participation while employed by Legacy ELMS.[19]  The court further discussed Taylor's and Luo's participation in the Merger as directors of Legacy ELMS.[20]

Plaintiffs amended their complaint on May 31, 2024, adding new claims and naming additional parties.[21]  The Amended Complaint asserts claims for breach of fiduciary duty against Forum III directors Marshall Kiev, David Boris, Richard Katzman, Steven Berns, Neil Goldberg, and Jeffrey Nachbor (the "Director Defendants").  It also adds the following claims against SF Motors and Jefferies (the "Entity Defendants"):

- Count V: Aiding and Abetting Breach of Fiduciary Duty Against SF Motors;

- Count VI: Aiding and Abetting Breach of Fiduciary Duty Against Jefferies;

- Count VII: Unjust Enrichment Against Jefferies; and

- Count VIII: Unjust Enrichment Against SF Motors.[22]

---

[18] *Id*. at *5.

[19] *Id*.

[20] *Id*. at *5–6.

[21] Dkt. 168.

[22] Am. Compl. ¶¶ 292–327.

The Entity Defendants moved to dismiss on July 29, 2024.[23] The parties completed briefing on November 8, 2024, and the court heard oral argument on March 5, 2025.[24] After briefing concluded, the Supreme Court issued two decisions further clarifying aiding and abetting's "knowing participation" element: *In re Mindbody, Inc., Stockholder Litigation*[25] and *In re Columbia Pipeline Group, Inc. Merger Litigation*.[26] Those decisions clarified aspects of the aiding and abetting standard governing the Entity Defendants' motions to dismiss.[27]

The court therefore requested supplemental briefing discussing *Mindbody*'s and *Columbia Pipeline*'s impact on the viability of Plaintiffs' aiding and abetting claims.[28] The parties filed the requested supplemental briefs on September 3, 2025.[29]

## II.    LEGAL ANALYSIS

The Entity Defendants have moved to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief can be granted. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable

---

[23] Dkts. 187, 191.

[24] Dkt. 219; Dkt. 226 ("Jefferies Reply Br."); Dkt. 225 ("SF Motors Reply Br."), Dkt. 236.

[25] 332 A.3d 349 (Del. 2024).

[26] 342 A.3d 324 (Del. 2025).

[27] Dkt. 210 at 18–25; Dkt. 212 ("SF Motors Opening Br.") at 21–28.

[28] Dkt. 246 at 4–5.

[29] Dkt. 255 ("Pls.' Suppl. Br."); Dkt. 256 ("Jefferies Suppl. Br."); Dkt. 257 ("SF Motors Suppl. Br.").

'conceivability.'"[30] When considering a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true, . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[31] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[32]

Plaintiffs assert claims for aiding and abetting breaches of fiduciary duty and unjust enrichment against the Entity Defendants. Plaintiffs allege that each knowingly participated in the Director Defendants' breaches of fiduciary duty, thereby depriving Plaintiffs of the ability to exercise their redemption rights in a fully informed manner. Plaintiffs further allege that both Entity Defendants were unjustly enriched by the Merger. The Merger allowed SF Motors to receive cash and stock for its Indiana Plant among other things, and Jefferies extracted over $19 million in fees in connection with the Merger.

---

[30] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[31] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[32] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

### A. Aiding And Abetting Claims

"To state a claim for aiding and abetting, a plaintiff must allege that a third party knowingly participated in a breach of fiduciary duty."[33] The Entity Defendants do not dispute the existence of a well-pled claim for breach of fiduciary duties. They argue instead that Plaintiffs have not adequately alleged that they knowingly participated in the well-pled fiduciary breaches.

"'A claim of knowing participation need not be pled with particularity,' but a plaintiff must 'make factual allegations from which knowing participation may be inferred in order to survive a motion to dismiss.'"[34]

Knowing participation "involves two distinct concepts that are sometimes analyzed separately: knowledge and participation."[35]

"Knowledge" means the alleged aider and abettor has "knowledge that the primary party's conduct was a breach" and "knowledge 'that their conduct was legally improper.'"[36] In *Columbia Pipeline*, the high court held that constructive knowledge

---

[33] *Sjunde AP-Fonden v. Activision Blizzard, Inc.*, 2025 WL 2803254, at *25 (Del. Ch. Oct. 2, 2025).

[34] *Sam I Aggregator LP v. Mars HoldCo Corp.*, 2025 WL 2375279, at *9 (Del. Ch. Aug. 15, 2025) (citation modified) (quoting *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *14 (Del. Ch. Dec. 10, 2018)).

[35] *Mindbody*, 332 A.3d at 390.

[36] *Id*. at 391 (quoting *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015)).

is not enough.  Aiding and abetting requires "actual knowledge" or "'real knowledge' that is 'clear and direct.'"[37]

"Participation" exists where an aider and abettor substantially assists the fiduciaries in breaching their duties.[38]  Substantial assistance involves "overt participation such as active 'attempts to create or exploit conflicts of interest in the board' or an overt conspiracy or agreement between the buyer and the board."[39]  "A 'failure to act' and 'passive awareness' are insufficient."[40]  Determining whether an alleged aider and abettor's conduct amounts to substantial assistance requires a "nuanced analysis."[41]

To assess both knowledge and participation, the high court in *Mindbody* and *Columbia Pipeline* adopted the four-factor approach that this court articulated in *In re Dole Food Co., Inc. Stockholder Litigation*[42] based on Section 876, comment d, of the Restatement (Second) of Torts:[43]

> The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the

---

[37] *Columbia Pipeline*, 342 A.3d at 356 & n.194 (quoting *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184–85 (2020)).

[38] *Mindbody*, 332 A.3d at 392 (quoting *In re Dole Food Co. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015)); *Mars HoldCo*, 2025 WL 2375279, at *9.

[39] *Mindbody*, 332 A.3d at 393 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001)); *see also Activision*, 2025 WL 2803254, at *26 (citations omitted).

[40] *Activision*, 2025 WL 2803254, at *26 (quoting *Mindbody*, 332 A.3d at 399).

[41] *Mars HoldCo*, 2025 WL 2375279, at *9.

[42] 2015 WL 5052214 (Del. Ch. Aug. 27, 2015).

[43] *Mindbody*, 332 A.3d at 395; *see also Columbia Pipeline*, 342 A.3d at 358; *Activision*, 2025 WL 2803254, at *26.

> clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects;
>
> The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;
>
> The nature of the relationship between the secondary and primary actors; and
>
> The secondary actor's state of mind.[44]

Although the Supreme Court has acknowledged that these factors provide "a helpful analytical framework for assessing substantial assistance, knowledge, and participation," it held that the "relevance of each factor depends on the facts of the case."[45]

### 1.    SF Motors

Plaintiffs allege that SF Motors knowingly participated in the Director Defendants' breaches by failing to correct materially misleading disclosures in the Proxy Statement. They contend SF Motors acted through Taylor (SF Motors' co-CEO), Luo (SF Motors' Chairman), Albert Li (SF Motors' CFO), Justin Prann (SF Motors employee), Benjamin Wu (SF Motors' General Counsel), and Kev Adjemian (SF Motors employee) in aiding and abetting breaches by Forum III's fiduciaries. This court has already held that Plaintiffs adequately alleged that Taylor and Luo aided and abetted Forum III's fiduciary breaches in three categories of disclosures.

---

[44] *Dole*, 2015 WL 5052214, at \*42; *see also* Restatement (Second) of Torts § 876 cmt. d (Am. L. Inst. 1979).

[45] *Columbia Pipeline*, 342 A.3d at 358 (quoting *Mindbody*, 332 A.3d at 395–96).

To implicate SF Motors, Plaintiffs allege that after abandoning its plans to build electric vehicles in the United States, SF Motors hired Taylor as its co-CEO to create a divestment plan for the Indiana Plant. Then, SF Motors named Li as its "CFO to guide the financial aspect of working with investment bankers to help identify a SPAC counterparty."[46]

After negotiations with Forum III began, Taylor facilitated a presentation titled "[SF Motors] U.S. James Taylor Report."[47] It stated that pursuing a SPAC deal would provide SF Motors with financial benefits associated with avoiding operating costs and impairment of the Indiana Plant. Taylor listed a SPAC deal as his highest priority option and explained that SF Motors would need to be a new 100% U.S. company to pursue SPAC engagements. After receiving the presentation, SF Motors directors assigned U.S. employees (*i.e.*, Adjemian, Wu, and Prann) to assist Legacy ELMS with a SPAC merger that would divest its Indiana Plant.

As SF Motors' co-CEO and Chairman, Taylor and Luo were motivated to divest SF Motors' Indiana Plant. Plaintiffs allege Luo used Legacy ELMS "to help facilitate SF Motors' divestment of the Indiana Plant"[48] and that "Taylor 'co-founded' Legacy ELMS with Luo in August 2020 to facilitate SF Motors' divestment of the Indiana Plant."[49] Li too was hired for the purpose of facilitating a SPAC merger, and SF

---

[46] Am. Compl. ¶ 63.

[47] *Id*. ¶ 100.

[48] *Id*. ¶ 39.

[49] *Id*. ¶ 40.

Motors loaned other individuals to Legacy ELMS to assist with the SPAC merger process.

Plaintiffs further allege that Luo and the other SF Motors employees used their SF Motors emails to facilitate the Merger. For example, Luo's review of the Proxy Statement was facilitated through his SF Motors email address.

The major defect with Plaintiffs' claims against SF Motors is that none of the facts alleged connect SF Motors to the three categories of disclosure deficiencies underlying the claims against it. This defect permeates all aspects of the Restatement analysis.

The first Restatement factor "goes to the first knowledge requirement for a finding of *scienter* under the 'knowing participation' element of an aiding and abetting claim: whether [SF Motors] acted 'with the knowledge that the conduct advocated or assisted constitutes such a breach.'"[50] The Supreme Court in *Columbia Pipeline* and *Mindbody* found that this factor weighed in favor of a finding of knowing participation.[51] The aider and abettor in both cases—an acquiror—had first-hand knowledge of information omitted from a target company's proxy statement and reviewed drafts of the proxy statement while under a contractual obligation to correct misleading information.[52]

---

[50] *Mindbody*, 332 A.3d at 396 (quoting *Malpiede*, 780 A.2d at 1097).

[51] *Columbia Pipeline*, 342 A.3d at 368–70; *Mindbody*, 332 A.3d at 397–98.

[52] *Columbia Pipeline*, 342 A.3d at 350–51, 370; *Mindbody*, 332 A.3d at 375, 377–78, 380.

Here, SF Motors is not alleged to have supplied or known of the omitted information in this case, and SF Motors did not have any right to review the Proxy Statement. This is why Plaintiffs seek to impute the actions of Taylor and Luo to SF Motors. The prior dismissal decision focused on Taylor's and Luo's managerial and director roles with Legacy ELMS. "The Merger Agreement required [Legacy ELMS] to review the Proxy, and Luo and Taylor represented [Legacy ELMS] in its dealings with Forum III."[53] Plaintiffs now say that Taylor and Luo additionally acted on SF Motors' behalf.

To impute the actions of Taylor and Luo to SF Motors, Plaintiffs must allege an agency relationship between Taylor and Luo and SF Motors[54] and that they were acting within the scope of that relationship.[55] This court applies a multi-factor analysis when addressing these issues.[56]

Taylor and Luo had significant positions at SF Motors as co-CEO and Chairman, respectively. And Plaintiffs have alleged facts sufficient to show that

---

[53] *Electric Last Mile Sols.*, 2024 WL 223195, at *5.

[54] *See Otto Candies, LLC v. KPMG, LLP,* 2020 WL 4917596, at *9 (Del. Ch. Aug. 21, 2020)).

[55] *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1200 (Del. 2015) (stating that a court determines whether challenged conduct falls within the scope of a tortfeasor's employment by assessing whether the conduct "(1) . . . is of the kind he is employed to perform; (2) it occurs within the authorized time and space limits; (3) it is activated, in part at least, by a purpose to serve the master; and (4) if force is used, the use of force is not unexpectable by the master" (quoting Restatement (Second) of Agency § 228 (Am. L. Inst. 1958)).

[56] *Id.*

pursuing a SPAC transaction was among Taylor's and Luo's responsibilities at SF Motors. But Plaintiffs allege no facts sufficient to tie the omitted information to SF Motors or show that withholding that information was within the scope of Taylor's or Luo's responsibilities for SF Motors. The "extraordinary projections" were Legacy ELMS projections[57] and the "hyping" period began after Taylor and Luo were employed by Legacy ELMS.[58] The supplier agreement was between Legacy ELMS and Wuling.[59] Taylor's and Luo's acquisitions of ELMS holdings prior to the Merger had nothing to do with SF Motors.[60]

At best, Plaintiffs have alleged that SF Motors received relevant information because the negotiators used their SF Motors email accounts when reviewing the Proxy Statement. But this allegation does not demonstrate that withholding the information was within the scope of Taylor's and Luo's responsibilities for SF Motors.

The second factor also supports dismissal. Because it is not reasonable to impute the actions of Taylor and Luo to SF Motors, the amount, kind, and duration of alleged assistance by SF Motors is non-existent. SF Motors did not have any right to review the Proxy Statement or duty to correct it. Delaware law does not impose a

---

[57] *Electric Last Mile Sols.*, 2024 WL 223195, at *3.

[58] *See* Am. Compl. ¶¶ 127, 129–36.

[59] *See Electric Last Mile Sols.*, 2024 WL 223195, at *3.

[60] *Id.*

general duty on third parties to correct a fiduciary's disclosures.[61] And the Supreme Court in *Mindbody* and *Columbia Pipeline* have settled that a party's failure to correct an incorrect proxy statement, even in the face of a contractual duty to do so, is not enough for a defendant's conduct to amount to substantial assistance.[62]

The third factor similarly supports dismissal. The nature of the relationship between SF Motors and the primary actors, Forum III's directors, does not demonstrate knowing participation. SF Motors sold the Indiana Plant to Legacy ELMS, which later merged with Forum III in a de-SPAC transaction. Thus, the relationship was once-removed and adverse.

The last factor is more of the same. The last factor generally deals with "the other knowledge requirement for a finding of *scienter*: the requirement that the aider and abettor must know that its own conduct was legally improper."[63] As already discussed, Plaintiffs fail to allege that SF Motors had any notable involvement with drafting the allegedly misleading Proxy Statement, either in its own right or through Taylor or Luo. SF Motors therefore had no reason to believe it was engaged in any legally improper conduct.

---

[61] *Buttonwood Tree Value P'rs, L.P. v. R.L. Polk & Co., Inc.*, 2017 WL 3172722, at *10 (Del. Ch. July 24, 2017) ("A general duty on third parties to ensure that all material facts are disclosed, by fiduciaries to their principals, is, so far as I am aware, not a duty imposed by law or equity." (emphasis omitted)).

[62] *Columbia Pipeline*, 342 A.3d at 368, 372; *Mindbody*, 332 A.3d at 400–01.

[63] *Mindbody*, 332 A.3d at 404 (citing *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015)).

Because Plaintiffs fail to plead knowing participation, they fail to state a claim of aiding and abetting against SF Motors.

### 2. Jefferies

Plaintiffs claim that Jefferies aided and abetted the Director Defendants' fiduciary breaches by helping to prepare the Proxy Statement and drafting board presentations—all of which, Plaintiffs say, were materially misleading.

Plaintiffs allege that the Proxy Statement, which Jefferies reviewed and approved, contained three categories of misrepresentations that Jefferies knew were false.

First, the Proxy Statement stated that Forum III did not contact any prospective target companies before the IPO. It also stated that, "following our IPO, we searched for business combination candidates."[64] Plaintiffs allege that Forum III management met with Legacy ELMS before the IPO on August 14, 2020, and that the Director Defendants conducted no search for businesses, selecting Legacy ELMS as its target before the IPO.

Second, the Proxy Statement failed to disclose Jefferies's conflict arising from its prior work for SF Motors. It represented that "Jefferies has not performed past services for any parties to the Merger Agreement or their affiliates."[65] Yet SF Motors retained Jefferies to evaluate the Indiana Plant before the IPO.

---

[64] Am. Compl. ¶ 141.

[65] *Id.*

Third, the Proxy Statement contained financial projections that conflicted with earlier projections that Jefferies received. As part of its pre-IPO work with SF Motors, Jefferies created a presentation projecting and EBITDA of $110 million for 2023 and $192 million for 2024. The pre-IPO projections also estimated revenue for 2023 to be $765 million and $1.136 billion for 2024. But the Proxy Statement estimated 2023 and 2024 EBITDA at $248 million and $465 million, respectively. The revenue projections in the Proxy Statement also differed significantly—$1.177 billion for 2023 and $1.906 billion for 2024. The Proxy Statement does not mention the lower pre-IPO projections.

Jefferies also drafted the September 2020 board presentation and December 2020 stockholder presentation. Jefferies presented the September 2020 deck to Forum III's board and the December 2020 presentation was disclosed to Forum III's stockholders. Both presentations represented that the Indiana Plant had 400 employees and that its annual production capacity was over 100,000 vehicles. Jefferies allegedly knew that the Indiana Plant could only handle 50,000 to 70,000 vehicles per year based on information it received during its pre-IPO work for SF Motors. It also received a document explaining that Legacy ELMS furloughed 374 employees at the Indiana Plant, leaving only 16 full-time employees. The December 2020 presentation also contained the financial projections disclosed in the Proxy Statement that conflicted with the earlier projections Jefferies received while working for SF Motors. And the September 2020 presentation allegedly contained more optimistic financial projections as well.

The Amended Complaint states a claim against Jefferies for aiding and abetting breaches of fiduciary duty.

Starting with the first *Mindbody* factor, Plaintiffs allege that as a financial advisor to Forum III and SF Motors, Jefferies possessed first-hand knowledge that Forum III's disclosures misled stockholders and the Forum III board. And it is reasonably conceivable that Jefferies advised Forum III throughout the transaction and prepared presentations containing projections about Legacy ELMS's performance. SF Motors also retained Jefferies before the IPO during which time Jefferies received conflicting information about the Indiana Plant's capacity, workforce, and financial performance. Jefferies, as financial advisor, also had first-hand knowledge of Forum III's target search. The first *Mindbody* factor goes to Plaintiffs.[66]

As to the second *Mindbody* factor, Plaintiffs argue Jefferies substantially assisted the Director Defendants' breaches by failing to correct the Proxy Statement and creating materially misleading presentations.[67] They contend those actions created an "informational vacuum."[68] Also, Plaintiffs argue that Jefferies's actions

---

[66] The Supreme Court came to a similar conclusion in *Mindbody*. There, an acquiror learned through pre-merger discussions with the target company's fiduciaries that the target's proxy statement contained misleading statements. *Mindbody*, 332 A.3d at 396–98. While not an exact match, at the pleading stage, Plaintiffs' allegations demonstrate that Jefferies previously received information conflicting with the Proxy Statement.

[67] Pls.' Answering Br. at 63–64, 66–67; Pls.' Suppl. Br. at 11–17.

[68] Pls.' Answering Br. at 63–64, 66–67; Pls.' Suppl. Br. at 6–10.

were motivated by "powerful financial incentives" to close the Merger.[69] And they also point out that Jefferies was closely involved in the Merger on both sides, and therefore participated in a conflicted transaction.[70]

Jefferies responds that inaction is insufficient to plead "substantial assistance" and that Plaintiffs do not otherwise allege that Jefferies misled Forum III's fiduciaries or withheld information from them.[71] "Passive failure . . . to ensure adequate disclosure to stockholders, without more, cannot support an inference of scienter or knowing *participation* in a breach."[72] Mere knowledge that the Proxy Statement contained misleading information does not support an aiding and abetting claim.[73]

But Plaintiffs say that Jefferies's conduct exceeded passive failure because Jefferies authored the misleading presentations that created an informational vacuum.[74] To adequately allege knowing participation on this basis, Plaintiffs must support the inference "that directors were relying upon the financial advisor to

---

[69] Pls.' Answering Br. at 64–66.

[70] *Id*. at 68.

[71] Jefferies Opening Br. at 24–26; Jefferies Suppl. Br. at 9–10.

[72] *Buttonwood*, 2017 WL 3172722, at *11 (emphasis in original).

[73] *See In re Xura, Inc.,* 2018 WL 6498677*,* at *15 (rejecting a claim where the plaintiff only alleged the defendant "knew certain facts and knew that the Board was not disclosing those facts to stockholders").

[74] Pls.' Suppl. Br. at 6–7 (citing *RBC*, 129 A.3d at 862 (holding that a financial advisor "participat[ing] in [a] breach by misleading the board or creating [an] informational vacuum" can be liable for aiding and abetting) (internal quotation marks omitted) (quoting *In re Rural Metro Corp.*, 88 A.3d 54, 97 (Del. Ch. 2014))).

provide information that the board did not already know, or that the advisor knew the board was breaching its fiduciary duties."[75]  An aiding and abetting defendant does not create an informational vacuum merely by failing to disclose information of which it has "passive awareness."[76]  Silence is not "affirmative assistance" that "actively further[s]" the fiduciaries' "failure to inform themselves," which is required to establish substantial assistance.[77]

Plaintiffs allege more than passive awareness or silent assent.  According to the Amended Complaint, Jefferies created the allegedly misleading September 2020 and December 2020 presentations.  One was presented to the Forum III board (September 2020), the other was disseminated to stockholders (December 2020), and both contained the allegedly misleading representations that the Indiana Plant could produce over 100,000 vehicles per year and employed 400 workers.

The presentations also contained allegedly inflated financial projections.  Jefferies did not disclose to the Forum III board that it had learned from its prior work with SF Motors that the Indiana Plant furloughed all but 16 of its workers, could only produce 50,000 to 70,000 vehicles per year, and that the financial projections for the plant were much lower than what would be disclosed in the Proxy

---

[75] *See Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *16 (Del. Ch. Aug. 29, 2018) (first citing *Buttonwood*, 2017 WL 3172722, at *10, then citing *Singh, v. Attenborough*, 137 A.3d 151, 152 (Del. Ch.  2016), and then citing *Nebenzahah v. Miller*, 1996 WL 494913, at *7 (Del. Ch. Aug. 29, 1996)).

[76] *Witmer v. Armistice Cap., LLC*, 344 A.3d 632, 660–61 (Del. Ch. Aug. 14, 2025).

[77] *Id*. at 661 (quoting *Mindbody*, 332 A.3d at 398).

Statement.[78]   It also failed to include any of that pre-IPO information in the September 2020 presentation, creating a misleadingly optimistic impression of Legacy ELMS when the presentation was disseminated to stockholders. Authoring a materially misleading statement is different than failing to correct someone else's.[79] The second factor too favors Plaintiffs.

As to the third *Mindbody* factor, Jefferies served as Forum III's financial advisor in connection with the transaction.  Depending on the circumstances, deal parties may place significant reliance on their financial advisors' advice.  Under Delaware law, however, the relationship alone is not sufficient to implicate a financial advisor in fiduciary misconduct.[80]   Under the disclaimers of Jefferies's engagement letter,[81] Forum III essentially assumed the obligation of furnishing accurate information and disclaimed reliance on the accuracy underlying Jefferies's analyses.

---

[78] *Id*. ¶¶ 67, 69–70, 93–94, 104, 307.

[79] *Id*. ¶¶ 93–94, 106, 124, 130–31.

[80] *Singh*, 137 A.3d at 152 ("Delaware has provided advisors with a high degree of insulation from liability by employing a defendant-friendly standard that requires plaintiffs to prove scienter and awards advisors an effective immunity from due-care liability.").

[81] Jefferies Opening Br., Ex. D at 2 (stating that Jefferies would be relying on information it was provided "without having independently verified the accuracy or completeness thereof"); *id*. at 2–3 (noting that Jefferies did not "assume responsibility for the accuracy or completeness of any such information and data" and that Forum III would be "solely responsible for the accuracy and completeness" of materials relating to the Merger or public filings that were provided to Jefferies).  The court can take judicial notice of the engagement letter, which is incorporated by reference into the Amended Complaint.

The court need not accept those disclaimers as true at this stage, but they do inform the analysis. Overall, the third factor is neutral.

The final factor favors Plaintiffs. Taking all facts alleged as true, Jefferies would have known that drafting the December 2020 and September 2020 presentations would have misled the Forum III board and stockholders. Jefferies knew both presentations failed to include material information about the Indiana Plant's capacity, workforce, and financial performance. Jefferies also attended Forum III board meetings and reviewed the Proxy Statement, so it knew those facts were never disclosed to stockholders while its misleadingly optimistic statements were. It is reasonably conceivable that Jefferies knew its own conduct was improper.

Plaintiffs have demonstrated that three of the four *Dole* factors support an inference that Jefferies knowingly participated in the underlying breach. Jefferies's motion to dismiss Count IV is denied.

### B. Unjust Enrichment Claims

To state a claim for unjust enrichment, Plaintiffs must show: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, and (4) the absence of justification.[82]

Plaintiffs allege that both Entity Defendants were unjustly enriched by the Merger. In Count VII, they allege Jefferies extracted over $19 million in fees while stockholders were impoverished when they did not exercise their redemption rights

---

[82] *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 341–51 (Del. Ch. 2022).

due to inadequate disclosures. In Count VIII, they allege the Merger allowed SF Motors to receive cash and stock for its Indiana Plant and avoid current operating costs and impairment of one of its facilities. Plaintiffs contend this enrichment is directly related to the stockholders' impoverishment because it was a benefit of the Merger.

Plaintiffs predicate their claim for unjust enrichment on their claims of aiding and abetting. For that reason, Plaintiffs have not stated a claim for unjust enrichment against SF Motors. Count VIII is dismissed.

Plaintiffs have adequately alleged a claim for aiding and abetting against Jefferies. Jefferies was paid over $19 million. Forum III's stockholders lacked material information needed to make an informed decision on whether to redeem their shares. Jefferies's alleged knowing participation led to the impoverishment. And Jefferies lacks justification because it allegedly knowingly participated in the underlying fiduciary breaches.

The motion to dismiss Count VII is denied.

## III. CONCLUSION

SF Motors' motion to dismiss is granted. Jefferies's motion to dismiss is denied. IT IS SO ORDERED.

Sincerely,

*/s/ Kathaleen St. Jude McCormick*

Chancellor

cc:     All counsel of record (by *File & ServeXpress*)